*EMORY COLE, APPELLANT, v. THE MILLERTON IRON COMPANY AND OTHERS, RESPONDENTS.

*Fraudulent conveyance of all its property by one corporation to another*, ultra vires — *remedy of a judgment-creditor — notice of illegality of transfer, presumed — innocent bondholder not protected against claim of creditor — trustee cannot profit from his trust.*

One Cole sued the National Mining Company on October 1, 1887, and recovered judgment against it on July 14, 1888. On February 20, 1888, The Millerton Iron Company, which had the same officers as the National Company, purchased, substantially, all the property rights, ores, machinery, tools, personal effects and fixtures of the National Company for one dollar, and assumed the payment of certain debts of the latter company, which was then insolvent. At the same time the said Millerton Company purchased certain other adjacent mining properties, and voted to increase its capital stock to a large amount; and on the same day it mortgaged all these properties to a trust company to secure its bonds to the amount of $250,000. Bonds of the face value of $200,000 were pledged with a bank for a loan of $75,000, which in part was used to buy out the other companies, by one Barnum, president of both the above-named corporations. This loan was subsequently paid by Barnum, and thereupon the bank returned the bonds to him.

In an action by a judgment-creditor of the National Company to set aside the conveyance by the National Company to the Millerton Company:

*Held*, that as to the creditor the transfer was *ultra vires*.

That the officers of the National Company were bound, as trustees for such creditor, and all others interested in the company, to wind up its affairs and to apply its property to the payment of its debts.

That plaintiff could follow the property of the National Company in the hands of the fraudulent transferrees.

---

* Decided March 2, 1891.

That, whether the Trust Company had actual notice of the illegality of the transaction or not, notice must be imputed to it from the fact that the same persons. who conveyed the property of the National Company to the Millerton Company also executed the mortgage by the latter to the Trust Company.

That purchasers of the bonds, though innocent, taking through the Trust Company, were chargeable with notice of the infirmity of the title to the mortgaged premises as shown by the records.

That the loan to Barnum from the bank was a part of the fraudulent scheme in which he was the chief actor, and that the law would not assist a trustee, upon the theory that he had acquired the rights of his assignor as a *bona fide* holder of securities, to obtain property of his beneficiary without compensation.

APPEAL by the plaintiff from a judgment, entered in the clerk's office of Dutchess county on the 17th day of December, 1889, whereby the complaint was dismissed, with costs.

*Herrick & Losey,* for the appellant.

*H. D. Hufcut* and *Thomas Thacher,* for the respondents.

PRATT, J.:

The views which I have taken of this case require a reversal of the judgment appealed from. It is an action by a creditor of a corporation to set aside an alienation of its property in fraud of his rights, as he alleges. He had no judgment when the transfer was made, but I think it sufficiently appears that the company was indebted to him in fact; and the fact is that he subsequently obtained a judgment for his debt and now stands in the position of, and brings this action as, a judgment-creditor.

The defense is that the alleged fraudulent grantee mortgaged the property in question, with other lands, to the Mercantile Trust Company in trust to secure the payment of its bonds which are now held by innocent holders; and, therefore, as it is said, the plaintiff's right to follow the property of his debtor has been cut off in the interest of these alleged innocent bondholders. The plaintiff alleged, substantially, that not over twenty-five of these bonds of $1,000 each are now held by persons in good faith. Hence, if that be the fact, or if it shall appear that the right of those who do hold bonds in good faith may be worked out, without interfering with plaintiff's alleged right in the land fraudulently transferred, the court ought to provide means for the attainment of that result. It is thus apparent that the merits of the plaintiff's claim should be investigated from the beginning.

The case does not show the date of the origin of plaintiff's claim, but it does show that, on October 1, 1887, he sued the National Mining Company of Pauling to recover $5,000 damages, and that he recovered a judgment for $2,775 damages, with $288.74 costs upon that claim, besides other suitable relief, July 14, 1888. It also shows that an execution was issued upon that judgment, which was returned wholly unsatisfied. It must, therefore, be assumed that this judgment-debtor, the National Mining Company, owed this debt ($2,775) October 1, 1887.

It also appears that, on the 20th of February, 1888, this debtor corporation owned a large amount of land which is included in the mortgage to the Trust Company, and valuable leases for mining rights on other lands, and that on that day, being wholly insolvent and unable to pay its debts, it sold, assigned and conveyed all its property to the Millerton Mining Company in consideration of one dollar and the assumption by the latter of certain debts. It does not appear whether or not the plaintiff's claim was among those items assumed, and I think it is immaterial, since there is no suggestion that there has been any offer by anybody to pay the plaintiff's claim.

This sale to the Millerton Company was made under peculiar circumstances which render it, in my judgment, utterly indefensible as against plaintiff's claims. The executive officers of this grantor com pany were the same as those of the grantee company. Mr. Barnum being one of them; indeed, the chief actor in the business. The undisguised object of this transfer, as found by the learned trial judge, was that the National Mining Company should cease and never resume its business, and sell out all its property to the Millerton Company. The scheme seems to have been a sort of consolidation of the property of several mining corporations into the Millerton Company. For example, on the same day as this transfer by the National Mining Company, the Riga Mining Company conveyed all its property to the Dutchess Mining Company, which then conveyed it and all its other property to this Millerton Company, the same persons participating in, and, as I assume, directing the business scheme. The National Mining Company never did any business after this transfer.

There are several obvious reasons why the transfer by the

National Mining Company cannot be upheld as against the plaintiff. In the first place it was *ultra vires* within well-established rules, not only as against judgment-creditors, but as against every person interested in that company; and the plaintiff, as an existing creditor of the company, was interested in it and in the lawful discharge of its duties. Its property, the whole of it, was a trust fund held by it in trust, primarily for its creditors; and it, like every other debtor, was bound to see to it that that implied trust was performed. So, too, its officers were bound, as trustees, for the plaintiff and all other persons interested in that company to perform those duties. Unlike the case of an individual debtor, it was unlawful for this corporation to sell out its property, under these circumstances, for the purpose of committing suicide, no matter whether it acted in good faith or not, and utterly independent of the question of its solvency. Again, being insolvent, its transfers were void. Its officers knew, or were bound to know all this, and I cannot conceive how they could have acted in what the law calls good faith in view of all these facts. They must have known of the pendency of plaintiff's suit. It was their duty to wind up that company and apply its property to the payment of its debts, the plaintiff's among the rest. It is no answer to say that the Millerton Company owned all its stock. That fact rather aggravates than palliates or excuses the transaction. The rights of stockholders were subordinate to the plaintiff's rights as a creditor, irrespective of whether he had a judgment or not. Indeed, it was only because he had no judgment that the wrong was possible. And these officers, who thus owed these duties to the plaintiff, were also officers, and the managing officers of the Millerton Company, the grantee, thus disclosing another and independent reason why the sale should not stand, and quite aside from the question of notice of the illegality of the sale itself on grounds above stated. They were the actors for both the seller and the buyer, and besides that, the buyer thus had full notice of the other infirmities of the transaction as against plaintiff and his claim.

This transfer must, therefore, be regarded as indefensible, and we must treat it as void as against the plaintiff and let him follow and obtain satisfaction of his claim out of the property thus fraudulently transferred, unless some insurmountable obstacle has intervened to prevent us from discharging that plain duty.

Let us now go to that question : The facts found by the learned trial judge, or otherwise apparent from the undisputed evidence, are that it was a part of the scheme of these managing officers to increase the capital of the Millerton Company, in which they were personally interested, predicating that increase in part, at least, upon the property acquired at this time.   No doubt, it was partly predicated upon the property thus fraudulently and unlawfully diverted from plaintiff's claim.   They also intended that the Millerton Company should issue bonds to the extent of $250,000, to be secured by mortgage to the Trust Company ; and, either to secure old debts therewith or raise money for use in its business, the Millerton Company, did issue such bonds and, on the same day when this fraudulent and unlawful transfer was made against plaintiff's rights, executed and delivered a mortgage to the Trust Company to secure the payment of these bonds, covering the property out of which plaintiff was entitled to the satisfaction of his debt.   I take it to be plain that if the Trust Company had either actual notice of this infirmity in the title of the Millerton Company or notice sufficient to put it on inquiry, that notice is to be imputed to the persons who took and claim to hold security through the mortgage for the payment of the bonds.   So, too, since the Trust Company advanced no money itself, but simply acted as a trustee for the bondholders, I suppose that it can have no greater rights under the mortgage than the bondholders themselves.   And if these bondholders, or any of them, could not themselves enforce their lien, then the Trust Company cannot enforce it for them.   This must be true of each separate bondholder who had notice, or notice sufficient to put him on inquiry, or who otherwise stood in such relation to the original transaction that he ought not, in equity, to obtain anything for himself as against the plaintiff.

Keeping these propositions in mind, how stands the case as to the Trust Company ?   If the date of the record of its mortgage appears in the case, I have overlooked the fact.   I assume that it was promptly recorded and must treat that transaction as completed on the day of its date, February 20, 1888.   Did it examine the title ? If not, why not ?   Assuming that it did examine the title, it must have found the common officers of the National Mining Company as the active agents and officers of the Millerton Company in that

transaction by which plaintiff, on the very day of the date of this mortgage, was defrauded. The same persons who conveyed the property of the National Trust Company to the Millerton Company executed the mortgage by the latter to the Trust Company. And, since that conveyance swept out all the property of the grantor corporation, and since it must have seen that the other mortgaged property had fallen into this consolidation scheme, it is scarcely reasonable to presume that it did not have notice of, or sufficient notice to put it on inquiry with respect to, the real character of the transaction between the National Company and the Millerton Company. It is certain that it must have seen that the same persons were officers who acted for the buyer and seller, for their names appearing in the conveyance, including its own mortgage, must have suggested the fact. It seems to me that this suggestion did not receive due weight on the trial.

But, again, how stands the case with the bondholders for whose benefit alone the Trust Company may enforce this mortgage, if it is to be enforced at all. It is found that $25,000 of the bonds were sold to a Mr. Turner, of Chicago, and $25,000 were delivered to a Mr. Warren, of Troy, as security for notes of the Millerton Company, amounting to $20,000. It does not appear whether or not that $20,000 note was for a new or old debt; but no matter. The remaining $200,000 of bonds were delivered to the Western National Bank as collateral to a note made by the Millerton Company for $75,000, which note was indorsed by Mr. Barnum and Mr. Frink, the chief actors in the original unlawful transfer by which plaintiff was defrauded. Now, it may well be that these bondholders could hold and enforce their bonds against the Millerton Company, but their right to a lien under this mortgage, as against plaintiff, is quite another affair. If the Trust Company is chargeable with notice of plaintiff's equity, I take it that none of the bondholders could enforce the lien of this mortgage as against plaintiff on the property which came from the National Company. And why are they not chargeable themselves with notice of anything appearing of record or in the line of the title to the lands and property against which they claim a lien?

In respect to the $200,000 of bonds held by the Western Bank, it appears that they came back to Mr. Barnum, the chief actor in

the transfer between the National and the Millerton Companies, the man who was an officer and trustee of both, and who was, therefore, a trustee charged with trust duties to see to it that the property of the National Company was applied to plaintiff's debt before it could be lawfully or honestly taken by a company in which he was personally interested — in a sense, taken partly for his own benefit. What, therefore, was Mr. Barnum's legal rights respecting this lien under this mortgage on these $200,000 of bonds? He was an indorser on the note held by the Western Bank ; in a sense he was a part of the bank's collateral. His, and the bonds of Mr. Frink, constituted the collateral. If Mr. Barnum shall be permitted to enforce the lien under this mortgage, it will transpire that he will be permitted, in this indirect way, to utilize his own original breach of trust towards plaintiff, his own illegal act, for his own advantage. In other words, he will get for himself what he was bound to save and apply to the payment of plaintiff's claim. Going back to his relations to these notes and bonds held by the bank, suppose that the bank had taken this mortgage and these bonds directly as collateral to the Millerton Company's note, indorsed by Mr. Barnum, and that the bank had attempted to foreclose, were not plaintiff's equities such that he could have required the bank to resort to Mr. Barnum's personal liability on his indorsement of the note before having recourse to the lien under the mortgage on the land which constituted a *trust fund* for the payment of plaintiff's claim? I fail to see why equity would not have required precisely that, if it were necessary, in order to save his rights. If so, Mr. Barnum could not have been subrogated to the position of the bank, even if it had held the bonds without notice of plaintiff's equity, a position which I seriously doubt. But, perhaps, that question is not involved. Mr. Barnum bought the bonds, as it is said, from the bank. He, therefore, claimed to hold the benefit of the bank's lien under the mortgage. But he had notice of the plaintiff's equity. And it is answered that he bought the bank's right under the mortgage and may, therefore, enforce that new title even as against his own notice. Perhaps that might do if it were simply a matter of notice ; but that is not the trouble. If his scheme should succeed, he would thus get *plaintiff's property* flat in the face of his own wrong and breach of trust, and of his own personal liability for that breach of trust

to plaintiff  If he were to get it in·any way, it would be impressed with the original trust which he was bound to respect and perform, and I think that equity would convert him into a trustee, *pro tanto,* for plaintiff's benefit.   Equity will not recognize or tolerate any method by which a trustee shall thus obtain the property of his beneficiary without just compensation.

Without pursuing the subject further, I state, on my own conclusion, that, upon the facts appearing in this case, this mortgage is subject to the plaintiff's right to enforce his payment against that part of the mortgaged premises which came from the National Mining Company, and that the conveyance by it and the Trust Company's mortgage is void as against that payment.   But, since the facts may be changed on a new trial, I hold that a new trial should be granted, with costs of this appeal to plaintiff, to abide the event of the action.   It is plain to my mind, in any event, that equity demands that the Trust Company should be required· by injunction to abstain from any recourse to the property which the Millerton Company obtained from the National Company, until it has exhausted its remedy against other parts of the mortgaged premises and against the Millerton Company itself, before interfering with the land on which plaintiff's equity rests; and that the mortgage cannot be enforced as against plaintiff's equity, for Mr. Barnum's benefit, on these $200,000 bonds.

The judgment should, therefore, be reversed and new trial granted, with costs to abide event.

CULLEN, J., concurred; DYKMAN, J., dissented.

Judgment reversed and new trial granted, costs to abide event.